## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**UNITED STATES OF AMERICA,**

         **Plaintiff,**

     **v.**

**ROBERTSON TERMINAL
WAREHOUSE, INC., et al.,**

        **Defendants.**

</td><td>

**Civil Action 73-01903 (HHK)**

</td></tr>
</table>

<table>
<tr><td>

**UNITED STATES OF AMERICA,**

         **Plaintiff,**

     **v.**

**HERBERT BRYANT, INC., et al.,**

        **Defendants.**

</td><td>

**Civil Action 73-02211 (HHK)**

</td></tr>
</table>

### MEMORANDUM OPINION

This action was filed by the United States to quiet title to lands along the Potomac River waterfront in Alexandria, Virginia. The United States asserts that it has title to all land–both submerged and fast[1]–east of the January 24, 1791, high water mark ("1791 mark") on the Virginia side of the Potomac River and seeks a declaration from this court that it is the owner of,

---

[1] Here, "fast lands" refers to land that is above or landward of the existing high water mark. "Submerged lands" refers to land that is below the existing high water mark.

and entitled to possess, this land.  The United States has named numerous holders of record title[2] as defendants, including Old Dominion Boat Club ("Old Dominion").  Old Dominion holds record title to two tracts of land in the disputed area known as the North and South Tracts. Asserting that it has the right to possess the fast land on these tracts, even if this fast land is east of the 1791 mark,[3] Old Dominion moves for summary judgment.  Upon consideration of the motion, the opposition thereto, the parties' supplemental briefing, and the record of this case, the court concludes that Old Dominion's motion must be granted in part and denied in part.

## I.  BACKGROUND

To understand the United States' title claim, some historical background is necessary. Before the American Revolution, the King of England granted Lord Baltimore all land within what is now the state of Maryland, including the bed of the Potomac River to the high water mark on the Virginia shore.[4]  After the American Revolution, all of Lord Baltimore's land and

---

[2]  Holders of record title are individuals or entities that hold deeds listing them as owners of land.

[3]  The North and South Tracts include both fast and submerged land.  Old Dominion moves for summary judgment only with respect to the fast land.  In its Opposition brief, the United States clarifies that it asserts title only to artificially created fast land on these tracts, such as fill and wharves.  The United States does not assert title to naturally created fast land, such as sediment deposited from accretion.  Accordingly, this memorandum opinion only addresses the issue of whether Old Dominion has a right to possess artificially created fast land on the North and South Tracts.

[4]  The King of England also granted Lord Fairfax land within what is now the state of Virginia.  Lord Fairfax's grant included title to the bed of the Potomac River.  Thus, Lord Baltimore and Lord Fairfax had competing grants to the bed of the Potomac River.  In *Morris v. United States*, the Supreme Court determined that, because Lord Baltimore's grant was first in time, Lord Baltimore held proper title to the bed of the Potomac River.  174 U.S. 196, 225-30 (1899).  Because Virginia succeeded to all land held by Lord Fairfax, Virginia has never held title to the bed of the Potomac River.

title thereto, including the bed of the Potomac River, passed to the state of Maryland.  *Morris v.*

*United States*, 174 U.S. 196, 225-30 (1899).  In 1791, Maryland ceded land to the United States

for the District of Columbia.  *Id.* at 230.  This cession included the bed of the Potomac River to

the high water mark on the Virginia shore.[5]  Accordingly, the bed of the Potomac River to the

high water mark on the Virginia shore has been part of the District of Columbia since 1791.

*United States v. Herbert Bryant*, 543 F.2d 299, 302 (D.C. Cir. 1976) ("Any land, either

submerged or fast, on the District of Columbia side of the 1791 high-water mark remained in the

District of Columbia since it was part of the 24 January 1791 Maryland cession to the United

States.").

        Since 1791, owners of waterfront property on the Virginia side of the Potomac River have

added fast land to their properties by laying fill and constructing wharves on its bed.  *Id.* at 300-

01 (noting that land at issue consists of submerged and artificially created fast land); Pl.'s Opp'n

Ex. 4 ("Report on Survey of Deeds and Related Materials" by Dr. John H. Moore, demonstrating

that significant portion of fast land on Alexandria waterfront is man-made).  Fill consists of

material artificially placed on the bed of the river to raise the bed of the river and create new fast

land.  Wharves are solid or open pile structures that are parallel or perpendicular to a riverbank.[6]

The United States contends that these additions were built on top of land to which the United

---

        [5]  Virginia also ceded land to the United States west of the Potomac River.  This meant
that when the District of Columbia was first formed in 1791, the Potomac River ran *through* the
District of Columbia.  In 1846, the United States retroceded all land west of the Potomac River to
Virginia, but retained all land ceded by Maryland in 1791.  This retrocession did not affect the
United States' title to the bed of the Potomac River because, as discussed in note 4 *supra*,
Virginia never had title to the bed of the Potomac River.

        [6]  The court defines the term "wharf" broadly to include structures that might be defined
as "piers."  The term "piers" refers to open pile structures perpendicular to a riverbank.

States has title–the bed of the Potomac River east of the 1791 mark.[7]  The United States contends

that, as a result, it has title to all of these additions.

## II. ANALYSIS

Old Dominion moves for summary judgment, asserting that it has the right to possess all

the fast land on the North and South Tracts, even if this land is east of the 1791 mark.[8]  While

recognizing that the United States holds title to the bed of the Potomac River to the 1791 mark,

Old Dominion nevertheless asserts that it is entitled to possess the fast land on the North and

South Tracts.  Old Dominion makes several arguments in support of its position.

First, Old Dominion asserts that the United States holds only trust title to the bed of the

Potomac River, rather than fee title.  According to Old Dominion, the United States holds this

land pursuant to two forms of trust: (1) a trust for the public purposes of navigation and fishery,

---

[7]  The United States asserts that it has title to this land because this land is within the boundaries of the District of Columbia.

[8]  Under Fed. R. Civ. P. 56, a motion for summary judgment should be granted only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party's "initial responsibility" consists of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  If the moving party meets its burden, the burden then shifts to the non-moving party to establish that a genuine issue as to any material fact actually exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To meet this burden, the non-moving party must show that "'the evidence is such that a reasonable jury could return a verdict'" in its favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Such evidence must consist of more than mere unsupported allegations or denials; rather, the non-moving party must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 321 n.3. If the evidence is "merely colorable" or "not significantly probative," summary judgment should be granted.  *Anderson*, 477 U.S. at 249-50.

and (2) a trust for future states.  Old Dominion contends that the trust title of the United States is extinguished when the bed of the Potomac River is no longer navigable and that the construction of wharves and fill on the North and South Tracts rendered the bed of the river underneath these structures unnavigable.  When the bed of the Potomac River is rendered unnavigable, Old Dominion asserts, title to the unnavigable portions reverts to the holder of record title, here Old Dominion.

Second, Old Dominion asserts that it has title to the fast land on the North and South Tracts pursuant to the doctrine of accretion.  The doctrine of accretion provides that riparian owners[9] have title to land deposited on their property due to the action of the adjoining body of water.  For example, a river's current may deposit sediment on a riparian owner's property.  Old Dominion asserts that, even though the fast land on the North and South Tracts may not have been created as a result of action by the Potomac River's waters, the doctrine of accretion is broad enough to grant Old Dominion title to this fast land.

Third, Old Dominion argues that, even if it does not have title to fast land east of the 1791 mark, riparian owners have the right to lay fill and construct wharves on the beds of navigable waters appurtenant to their properties, even if they do not have title to the underlying beds.  Old Dominion asserts that it is a riparian owner of property because it has title to land appurtenant to the Potomac River.  Accordingly, Old Dominion maintains that, even though the United States may have title to the bed of the Potomac River, Old Dominion has a right to lay fill

---

[9] "A riparian proprietor . . . is one whose land is bounded by a navigable stream." *Potomac Steamboat Co. v. Upper Potomac Steamboat Co.*, 109 U.S. 672, 682 (1883) (internal quotation omitted).  "[T]he rights which a riparian proprietor has with respect to the water are entirely derived from his possession of land abutting on the river."  *Id.* at 683 (internal quotation omitted).

and construct wharves on top of the bed of the Potomac River, as well as a right to possess these structures.  Old Dominion contends that, while it has a right to lay fill and construct wharves, this right is a *qualified* right because it is subject to the United States' authority to regulate navigation on the Potomac River.  Such regulation, Old Dominion argues, is accomplished through harbor lines established by the Army Corp of Engineers.[10]  Old Dominion asserts that, so long as fill and wharves are within harbor lines, it has the right to possess these structures.  Old Dominion contends that all fill and wharves on the North and South Tracts are within all relevant harbor lines.

Fourth, Old Dominion argues that the United States' action is barred by various equitable defenses.  With respect to such defenses, Old Dominion contends that the instant action is defeated by the doctrine of laches and principles of estoppel.  Old Dominion further contends that the United States' action is barred because Congress has ratified (*i.e.* approved) of the existence of privately-owned fill and wharves on the Alexandria waterfront.

Old Dominion lastly argues that it is a *bona fide* purchaser of land on the Alexandria waterfront.  As a result, Old Dominion argues, the United States cannot assert title to this land.

The United States rejoins that Old Dominion does not have title to fast land east of the 1791 mark because the United States has fee simple title to this land.  Because it has fee simple title, the United States contends that Old Dominion cannot acquire title to this land absent an express grant from Congress.

---

[10]  Harbor lines mark the area beyond which structures placed on the bed of a navigable body of water may interfere with navigation.

The United States next argues that Old Dominion does not have a right to lay fill or construct wharves on the bed of the Potomac River.  The United States asserts that riparian rights within the District of Columbia are governed by Maryland law as it existed in 1801.  Under this law, the United States asserts, absent explicit statutory authorization, riparian owners have no right to lay fill or construct wharves on the bed of the Potomac River.  The United States further maintains that, even if Old Dominion has a right to lay fill and construct wharves, this right is–as Old Dominion concedes–a qualified right that is subject to regulation by the United States.  The United States agrees with Old Dominion that, to the extent riparian owners have the right to lay fill and construct wharves, riparian owners can do so only shoreward of harbor lines established by the Army Corp of Engineers.  The United States contends that there is some land on Old Dominion's South Tract that falls outside (*i.e.* riverward) of the applicable harbor lines.  The United States also argues that, to the extent riparian owners can lay fill and construct wharves, they can do so only if the public has access to these structures.  The United States asserts that because Old Dominion has used the North and South Tracts solely for private purposes, Old Dominion's use of this land is improper.

Lastly, and predictably, the United States asserts that none of the equitable defenses raised by Old Dominion have merit.

## A.    Nature of the United States' Title to the Bed of the Potomac River

Old Dominion recognizes that the United States has title to the bed of the Potomac River, but asserts that the United States holds only "trust title."  Old Dominion contends that the United States holds title to the bed of the Potomac River pursuant to two forms of trust: (1) a trust for navigation and fishery, and (2) a trust for future states.  Old Dominion argues that this trust title

7

is extinguished whenever the Potomac River is no longer navigable due to the construction of fast lands, and that title reverts to the holder of record title, here, Old Dominion.

The United States rejoins that it has fee simple title, not trust title, to the bed of the Potomac River. The United States asserts that, as holder of fee simple title, it has full control over the bed of the Potomac River. The United States contends that, as a result, its title to the bed of the Potomac River is not extinguished when fast lands are constructed on top.

Neither party is correct. The United States holds fee title, not just trust title, to the bed of the Potomac River. The term "fee simple" does not adequately describe the nature of the United States' title, however. The United States' fee title in the bed of the Potomac River is subject to a public trust for navigation and fishery, and the United States cannot use or dispose of the bed of the Potomac River in such a way that would interfere with this trust.

### 1. The English Common Law Basis for the United States' Title

The nature of the United States' title in the bed of the Potomac River has its origins in English common law. Prior to the American Revolution, the King of England held fee title to all the navigable waters in the American territories, and this fee title was known as the "jus privatum." *Shively v. Bowlby*, 152 U.S. 1, 11-13 (1894); *Martin v. Waddell*, 41 U.S. 367, 409-10 (1842). This fee title was subject to a public right of navigation and fishery, known as the "jus publicum." *Shively*, 152 U.S. at 11-13; *Martin*, 41 U.S. at 411-12; *Boone v. United States*, 944 F.2d 1489, 1494, n.10 (9th Cir. 1991) (stating that the jus publicum is "the sovereign's right to jurisdiction and control over navigable waters for the benefit of the public"). Although the King was empowered to convey the fee title/jus privatum to others, this title was always subject to the public right of navigation and fishery/jus publicum. *Martin*, 41 U.S. at 409-10. In other words,

8

despite having fee title to the bed of navigable waters, neither the King nor those to whom the King granted title could interfere with the public right of navigation and fishery on these waters.

As described *supra,* before the American Revolution, the King of England granted Lord Baltimore fee title to the area now known as the state of Maryland.  This grant included title to the bed of the Potomac River to the high water mark on the Virginia shore.  *Morris*, 174 U.S. at 225-30.  Accordingly, Lord Baltimore was vested with both the jus privatum and jus publicum in the bed of the Potomac River.  *Id.* at 12; *Shively*, 152 U.S. at 11-13.  After the American Revolution, Lord Baltimore's land passed to the state of Maryland.  *Morris*, 174 U.S. at 225-30.  Thus, the state of Maryland held the jus privatum in the Potomac River, subject to the jus publicum.  In 1791, Maryland ceded title to the bed of the Potomac River, within the boundaries of the District of Columbia, to the United States.  As a result of Maryland's cession, the United States now holds the jus privatum in the bed of the Potomac River to the 1791 mark, subject to the jus publicum.

   2.  *The United States Has Fee Title in the Bed of the Potomac River, Subject to*
       *A Trust for the Public Right of Navigation and Fishery*

As holder of the jus privatum, the United States has fee title to the bed of the Potomac River.  The United States contends that the nature of this fee title is similar to the nature of fee simple title held by individuals who hold estates in lands.  The United States is incorrect.  Unlike such individuals, the United States does not have full discretion regarding the use of the Potomac River.  *See Coxe v. State*, 39 N.E. 400, 405 (N.Y. 1895) ("The title of the state to the . . . shores of tidal rivers is different from the fee simple which an individual holds to an estate in lands.").  The United States cannot use the Potomac River in such a manner that would interfere with the

jus publicum–the public right of fishery and navigation in the Potomac River.  *Shively,* 152 U.S. at 48-50.  In other words, while the United States has fee title to the bed of the Potomac River, the United States also holds this title subject to a trust for the public right of navigation and fishery.  *See Smith v. Maryland*, 59 U.S. 71, 74 (1855) ("this soil is held by the state, not only subject to, but in some sense in trust for, the enjoyment of certain public rights."); *Marine Ry & Coal Co. v. United States*, 265 F. 437, 441 (D.C. Cir. 1920) (stating that title to the bed of the Potomac River is in the United States and that this title "is held in trust for the nation and subject to public uses").

Old Dominion argues that the United States holds the bed of the Potomac River *solely* in trust for the public right of navigation and fishery.  While the premise of Old Dominion's argument is unclear, it appears that Old Dominion ignores the fact that the United States holds fee title in the bed of the River.  Old Dominion appears to assert that the United States holds the bed of the Potomac River *solely* for the purpose of protecting the public right of navigation and fishery.  Old Dominion contends that this trust title is eliminated whenever fast lands render the Potomac River unnavigable.

Old Dominion provides no authority to support the proposition that the United States holds the bed of the Potomac River solely in trust for purposes of protecting the public right of navigation and fishery.  Neither does Old Dominion provide any authority to support the proposition that the United States' trust title drops out whenever fast lands are constructed on top of the bed of the Potomac River.  As discussed *supra*, the United States holds the bed of the Potomac River in fee title, subject to a public trust for navigation and fishery.  The fact that the United States' fee title is subject to this trust neither diminishes nor alters the fact that the United

States holds fee title to the bed of the River.  Accordingly, the United States has fee title to the bed of the Potomac River regardless of whether fast lands are constructed on top of its bed.

### 3. *The United States Does Not Hold the Bed of the Potomac River Solely in Trust for Future States*

Old Dominion also argues that the bed of the Potomac River within the District of Columbia is held solely in trust for a future state, and that this trust title is extinguished whenever fast lands are constructed on top of the bed of the River.  According to Old Dominion, the bed of the Potomac River is held in trust because: (1) the United States may retrocede land to Maryland, including the bed of the Potomac River, and/or (2) the District of Columbia may one day become a state.

Old Dominion's argument is without merit.  Again, Old Dominion provides no authority to support the proposition that the United States' title is extinguished whenever fast lands are constructed on top of the bed of the Potomac River.  Furthermore, in support of its argument that the United States holds the bed of the Potomac River solely in trust for future states, Old Dominion relies on, and misreads, *Pollard's Lessee v. Hagan*, 44 U.S. 212 (1845).  *Pollard's Lessee* states that the United States holds the beds of navigable waters in territories in trust for future states, and that when these future states are formed, these states obtain full title to this land.  44 U.S. at 221-23, 230.  This finding was premised on the fact that the United States has "no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain, within the limits of a state or elsewhere, except in the cases in which it is *expressly granted*."  *Id.* at 223 (emphasis added).

What Old Dominion ignores is that *Pollard's Lessee* makes clear that the District of Columbia is a territory in which the United States is expressly granted the power to exercise municipal jurisdiction and sovereignty. *Id.* at 223. *Pollard's Lessee* states that "[b]y the 16th clause of the 8th section of the 1st article of the Constitution, power is given to Congress 'to exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may . . . become the seat of government of the United States." *Id.* As a result, "[w]ithin the District of Columbia . . . the national and municipal powers of government, of every description, are united in the government of the union.'" *Id.* Accordingly, the United States has the authority, pursuant to the Constitution, to hold fee title to the beds of navigable waters within the boundaries of the District of Columbia.

Furthermore, *Pollard's Lessee* involved land ceded by the state of Georgia to the United States for the express purpose of creating future states. *Id.* at 221 (the deed of cession by Georgia to the United States stipulated that "the territory thus ceded shall form a state. . . as soon as it shall contain sixty thousand free inhabitants, or at an earlier period if Congress shall think it expedient"). The deed of cession specified that the United States was to hold the territory at issue in trust solely for the "purposes of temporary government." *Id.* at 222.

In contrast, the United States does not hold the District of Columbia in trust solely for the purpose of temporary government. The District of Columbia is the permanent seat of the federal government. *See Morris*, 174 U.S. at 198-99 (recognizing that the District of Columbia was established as the permanent seat of the federal government). "The seat of government, unlike the territory acquired by conquest, treaty, and cession . . . [is not a] transitory territorial boundary. It [is] a part of the constitutional scheme to provide for the perpetual use of enough territory free

12

from State control to meet the demands of a permanent national seat of government." *James v. United States*, 38 Ct. Cl. 615, 1902 WL 1128, at *10 (Fed. Cl. 1903), *rev'd on other grounds*, 202 U.S. 401 (1906).  Thus, despite the possibility that the District of Columbia may one day become a state or be retroceded, the District of Columbia was, and is, intended to be the permanent location of the nation's capital.  Because the District of Columbia is not a mere territory that may one day be created into a state, the United States does not hold the Potomac River solely in trust for a future state.

**B.      Old Dominion Does Not Have Title to Fast Lands Due to Accretion**

Old Dominion next argues that it has full title to all artificially created fast lands on the North and South Tracts pursuant to the doctrine of accretion.  Old Dominion's argument is misplaced.

Accretion refers to the increase of riparian land by the gradual deposit, by water, of solid material, whether mud, sand, or sediment, so as to cause that to become dry land which was before covered by water.[11]  *See Giraud's Lessee v. Hughes*, 1 G&J 249, 1829 WL 1000, at *6 (Md. 1829) ("where a tract of land lies adjacent or contiguous to a navigable river . . . any increase of soil formed by the waters gradually or imperceptibly receding, or any gain by alluvion in the same manner . . . belong[s] to the proprietor of the adjacent or contiguous land").  The land that is deposited as a result of accretion is known as alluvion, and riparian owners gain title to the deposited alluvion.  *See California v. United States*, 457 U.S. 273, 277 (1982).  This alluvion may result from natural forces or artificial forces, such as the construction of jetties upland.  *Id.*

---

[11]  Old Dominion and the United States agree on this definition of the term "accretion."

Accretion does *not* refer to the purposeful addition of land to waterfront property through laying fill and construction of wharves. *See New Jersey v. New York*, 523 U.S. 767, 783 (1998) ("Under the common law, a littoral owner . . . cannot extend [its] own property into the water by landfilling or purposefully causing accretion.") (internal quotation omitted). Because the fast lands at issue here consist of wharves and fill, the doctrine of accretion does not apply. [12]

**C.      Riparian Right to Lay Fill and Construct Wharves on the Bed of the Potomac River**

As discussed *supra*, the United States has fee title to the bed of the Potomac River. Old Dominion now asserts that, as a riparian owner, it has the right to lay fill and construct wharves on the bed of the Potomac River. Old Dominion contends that this right is universally recognized in the United States.

The United States rejoins that this right is not universally recognized in the United States. Rather, the United States asserts, the nature of riparian rights varies from state to state and the court thus must look to the law of the District of Columbia to determine the nature of riparian rights in the Potomac River. The United States asserts that, pursuant to the Act of February 27, 1801, 2 Stat 103 (1801) ("Organic Act of 1801"), riparian rights within the District of Columbia are governed by Maryland law as it existed in 1801. The United States contends that, pursuant this law, riparian owners have no right to lay fill and construct wharves on the bed of the Potomac River.

Old Dominion rejoins that, to the extent that this court must look to Maryland law as it existed in 1801, it should find that this law *does* provide riparian owners with the right to lay fill

---

[12]   To the extent any fast land on the North and South Tracts was created by accretion, the United States does not assert title to this land.

and construct wharves.  Old Dominion also contends that this court should also look to Maryland law as it developed *after* 1801, as well as Virginia law, when determining whether Old Dominion has a riparian right to lay fill and construct wharves.  Old Dominion further asserts that the 1785 Compact between Maryland and Virginia ("1785 Compact") provides riparian owners with the right to lay fill and construct wharves.

The United States is correct that there is no universal right to lay fill and construct wharves and that Old Dominion's riparian rights in the Potomac River are governed by Maryland law as it existed in 1801, pursuant to the Organic Act of 1801.  Contrary to Old Dominion's argument, neither Maryland law as it developed after 1801 nor Virginia law applies within the District of Columbia.  Nor does the 1785 Compact between Maryland and Virginia have any bearing on Old Dominion's riparian rights.  The United States' interpretation of Maryland law of 1801 is incorrect, however.  The D.C. Circuit has interpreted Maryland law of 1801 as providing riparian owners with the right to lay fill and construct wharves on the bed of the Potomac River.

1.  *The Riparian Right to Lay Fill and Construct Wharves is Not Universally Recognized in the United States*

Old Dominion asserts that, in the United States, riparian owners have a universally recognized right to lay fill and construct wharves.  Old Dominion argues that the United States Supreme Court recognized this universal right in three decisions handed down in the nineteenth century: *Yates v. Milwaukee*, 77 U.S. 497 (1870), *Railroad Co. v. Schurmeier*, 74 U.S. 272 (1868), and *Dutton v. Strong*, 66 U.S. 23 (1861).  As Old Dominion notes, there is language in each cases that implies that such a right is universally recognized in the United States.  For example, in *Yates*, the Supreme Court stated that a riparian owner has "the right to make a

15

landing, wharf or pier for his own use or for the use of the public, subject to such general rules and regulations as the legislature may see proper to impose."  77 U.S. at 504.  Similarly, in *Schurmeier*, the Supreme Court stated that riparian owners have the right "to construct suitable landings and wharves."  74 U.S. at 289.  And in *Dutton*, the Supreme Court also said that riparian owners have the right to construct piers, landing places, and wharves for their own personal use. 66 U.S. at 32-33.

What Old Dominion fails to recognize, however, is that, in a subsequent case, *Shively*, the Supreme Court repudiated this language and stated that there is *no* such universally recognized right.  152 U.S. at 26 ("There is no universal and uniform law upon the subject.").  The Court stated that "none of the three cases called for the laying down or defining of any general rule, independent of local law or usage, or of the particular facts before the court."  152 U.S. at 37. The Supreme Court averred that the nature of riparian rights is instead determined by the law of the state that is sovereign over the body of navigable water at issue.  *Id.*  Accordingly, in order to determine the nature of riparian rights in the Potomac River within the boundaries of the District of Columbia, this court must look to the law of the District of Columbia.

   2.  *Riparian Rights in the Potomac River are Governed by Maryland Law as it*
       *Existed in 1801*

Riparian rights within the District of Columbia are governed by Maryland law as it existed in 1801.  Such is the rule laid down by the Organic Act of 1801.

The Organic Act of 1801 was enacted by Congress shortly after establishing the District of Columbia.  It provides that, until modified by Congress, the laws of Maryland and Virginia, *as they existed in 1801*, govern the areas of the District of Columbia that were ceded by each state.

16

2 Stat. at 108 (providing that the laws, "as they now exist shall be and continue in force in that part of the said district, which was ceded by that state to the United States"); *DeVaughn v. Hutchinson*, 165 U.S. 566, 570 (1897) ("We have only to do with [the law as] expounded and applied by the courts of Maryland while the land in question formed part of the territory of that state, and to further inquire whether, since the cession of the lands forming the District of Columbia, there has been any change in the law by legislation of Congress."); *Brooks v. Laws*, 208 F.2d 18, 25 (D.C. Cir. 1954) ("So far as the District of Columbia is concerned, the Organic Act of 1801 retained all laws of Maryland then in effect."); *United States v. Groen*, 72 F. Supp. 713, 719 (D.D.C. 1947) (same).  Because Maryland ceded the bed of the Potomac River to the United States, Maryland law as it existed in 1801 governs the bed of the Potomac River.  *See Morris,* 174 U.S. at 225-30.

Old Dominion argues that riparian rights in the District of Columbia are also governed by Maryland law as it developed *after* 1801.  This argument is without merit.  The Organic Act of 1801 could not be clearer on this point.  It was enacted in 1801 and states that the laws of Maryland "*as they now exist* shall be and continue in force."  2 Stat. at 104-05 (emphasis added). Thus, in determining the nature of riparian rights on the Potomac River within the District of Columbia, this court must disregard any developments in Maryland law that post-date 1801.

Old Dominion also contends that this court should consider Virginia law in determining the nature of Old Dominion's riparian rights–presumably because Old Dominion's property is located in Virginia.  Old Dominion's argument is misplaced.  The law of Virginia has no bearing on Old Dominion's riparian rights.  It is black letter law that riparian rights are governed by the law of the state in which the navigable body of water at issue is situated.  *Weems Steamboat Co.*

17

*of Baltimore City v. People's Steamboat Co.*, 214 U.S. 345, 355 (1909) ("The rights of a riparian owner upon a navigable stream in this country are governed by the law of the state in which the stream is situated."). The Potomac River was never located in Virginia, and Virginia law cannot create rights in property outside of Virginia's jurisdiction. Thus, even though Old Dominion's property is located in Virginia, the scope of riparian rights under Virginia law has no bearing on Old Dominion's riparian rights in the bed of the Potomac River.

Old Dominion lastly argues that this court should look to the 1785 Compact to determine the nature of Old Dominion's riparian rights. Again, Old Dominion's argument is misplaced. The 1785 Compact is an agreement regarding trade, fishing, navigation, and criminal jurisdiction over all waters in the Potomac River lying between Maryland and Virginia. *Virginia v. Maryland*, 540 U.S. 56, 61-62 (2003). In addition, it provides citizens of these states with the "privilege of making and carrying out wharves and other improvements, so as not to obstruct or injure the navigation of the river." *Id.* (*quoting* 1785 Compact). The 1785 Compact does not apply within the District of Columbia, however, because the District of Columbia was not a party to the 1785 Compact. *United States v. Dern*, 289 U.S. 352, 357-58 (1933); *Herald v. United States*, 284 F. 927, 928 (D.C. Cir. 1922) (recognizing that the 1785 Compact is inapplicable in area ceded for the formation of the District of Columbia); *Evans v. United States*, 31 App. D.C. 544, 1908 WL 27829, at *4 (D.C. Cir. 1908) ("The compact of 1785 never was in force in the District of Columbia."). Indeed, in *United States v. Hurley*, the court went insofar as to say, albeit in *dicta*, that "[i]t has been decided so frequently by the courts that [the 1785 Compact] is not in force in the District of Columbia as to almost render the question moot." 63 F.2d 137, 139

(D.C. Cir. 1933). Accordingly, riparian rights in the Potomac River are governed by Maryland law as it existed in 1801 (and subsequently modified by Congress).[13]

### 3. Maryland Law as it Existed in 1801 Provides Riparian Owners With the Right to Lay Fill and Construct Wharves

The United States contends that Maryland law as it existed in 1801 does not give riparian owners the right to make improvements to their property by laying fill and constructing wharves. Old Dominion rejoins that Maryland law as it existed in 1801 does give riparian owners such rights. Old Dominion has the better argument.

There is some historical and legal support for the United States' assertion that Maryland law as it existed in 1801 does not provide riparian owners with the right to lay fill and construct wharves. Upon achieving independence in 1776 after the American Revolution, Maryland's legislature enacted the Declaration of Rights. This Declaration of Rights provides that Maryland is governed by English common law. Md. Decl. Rights Art. 5(a) ("the inhabitants of Maryland are entitled to the Common Law of England"); *see also Khalifa v. Shannon*, 945 A.2d 1244, 1253 (Md. 2008) (recognizing that, pursuant to Article V of the Maryland Declaration of Rights, Maryland adopted English common law).

Under English common law, riparian owners do not necessarily have the right to make improvements to their property, such as by laying fill and constructing wharves. *Shively*, 152 U.S. at 14 ("the right . . . is not a title in the soil below high-water mark, nor a right to build

---

[13] Similarly, neither the 1877 Arbitration Award between Maryland and Virginia nor *Maryland v. West Virginia*, 217 U.S. 577 (1910) have any bearing on the instant case. These decisions do not apply to the Potomac River within the District of Columbia. *See Smoot Sand & Gravel Corp. v. Washington Airport*, 283 U.S. 348, 350-51 (1931); *Evans v. United States*, 31 App. D.C. 544, 1908 WL 27829, at *5 (D.C. Cir. 1908).

thereon, but a right of access only").  If the sovereign grants permission, however, then riparian owners can make improvements to their property.  *Id.*  ("By the law of England, . . . every building or wharf erected, *without license* . . . is a purpresture.") (emphasis added).

Because Maryland adopted English common law, it is reasonable to argue that riparian owners cannot lay fill or construct wharves without permission from the Maryland government. Indeed, the Maryland legislature enacted various statutes between 1745 and 1862 that appear to grant such permission to riparian owners.

In 1745, the Maryland legislature enacted legislation that permitted riparian owners to lay fill and construct wharves in the vicinity of Baltimore.  Md. Act 1745, ch. 9, sec. 10.[14]  In 1835, the Maryland legislature made it "lawful for any person owning real estate in fee simple on any of the navigable waters of this state to construct wharves thereon."  1835 Md. Laws, ch. 168. Then, in 1862, the Maryland legislature provided that "the proprietor of land bounding on any of the navigable waters of this State, is hereby entitled to the exclusive right of making improvements into the waters in front of his said lands."  1862 Md. Laws, ch. 129.  This 1862 statute significantly expanded the scope of riparian rights in Maryland.  *Harbor Island Marina, Inc. v. Bd. of County Com'rs of Calvert County, Md.*, 407 A.2d 738, 745 (1979) ("in 1862, the Maryland General Assembly extended the benefits and protections of these earlier Acts to all of

---

[14]  Many of the statutes and compacts from the eighteenth and nineteenth century are not easily accessible.  Old Dominion's motion for summary judgment is accompanied by an appendix that includes transcriptions of these statutes.  The United States does not contest the accuracy of these transcriptions, and the resolution of Old Dominion's motion for summary judgment does not turn on the accuracy of the transcriptions.  Accordingly, for purposes of this memorandum opinion, the court assumes that the transcriptions provided by Old Dominion are accurate.

the citizens of this State."); *Day v. Day*, 22 Md. 530, 1865 WL 1939, at *4 (Md. 1865) ("The Act of 1862 was intended to vest these owners of contiguous lands with rights and privileges not recognized by the Common Law.").  It would seem that these statutes would be superfluous if riparian owners had the right, at common law, to lay fill and construct wharves.  That is, if riparian owners do not need permission to lay fill or construct wharves, why would the state pass laws granting this permission?

Despite the historical support for the United States' argument, the D.C. Circuit has never adopted the United States' position.  Starting with *United States v. Belt*, the D.C. Circuit, which this court is bound to follow, has consistently interpreted Maryland law of 1801 as providing riparian owners with the right to lay fill and construct wharves. 142 F.2d 761, 767 (D.C. Cir. 1944).

In *Belt*, the United States brought an action to quiet title land bordering the Anacostia River in the District of Columbia.  142 F.2d at 762.  The landowners asserted that they had full title to this land and that they also had riparian rights in the Anacostia River.  *Id.* at 763.  The D.C. Circuit rejected the United States' claim to quiet title and recognized that these landowners had riparian rights in the Anacostia River.  *Id.* at 767.

The D.C. Circuit recognized that the extent of these riparian rights is governed by Maryland law.  *Id*.  The D.C. Circuit specified that the "[t]he extent of the right" was declared by the Maryland Court of Appeals in *Baltimore & O.R. Co. v. Chase*, 43 Md. 23 (1875).  *Id.*  The D.C. Circuit stated that, pursuant to *Chase,* riparian owners within the District of Columbia have "the right to make a landing, wharf, or pier, subject to such general rules and regulations as the State may think proper."  *Id.* (*citing Chase*, 43 Md. 23).

21

*Belt*'s discussion of the extent of riparian rights under Maryland law is *dicta*, however. After explaining that riparian owners have the right to make landings, wharves, and piers in the Potomac River, the D.C. Circuit stated that this discussion was unnecessary to resolve the issue before the court. *Id.* The D.C. Circuit concluded that it was "enough to say [that the landowners] . . . are riparian proprietors, with all the rights and privileges appertaining to such riparian property." *Id*. In other words, while the D.C. Circuit recognized that the owners of property along the Anacostia River had riparian rights, the D.C. Circuit did not find it necessary to determine the contours of this right, such as whether these riparian owners had the right to make landings or build wharves.

Dicta is not binding upon this court. The *dicta* of *Belt* is, however, crucial to the holding of  *United States v. Martin*, 177 F.2d 733 (D.C. Cir. 1949). In *Martin*, the United States claimed title to a parcel of land in the District of Columbia that fronted the Anacostia River. *Martin*, 177 F.2d at 733. In 1794,[15] the high water mark of the Anacostia River was approximately 60-80 feet east of Water Street in the District of Columbia. After 1794, the parcel of land at issue was extended, through fill, eastward into the Anacostia River. *Id.* The United States conceded that the owners of the parcel at issue had title to land west of the high water mark of 1794. The United States also conceded that the owners had riparian rights in the Anacostia River. The United States asserted, however, that the United States had title to all fill east of the high water

---

[15] It is unclear why *United States v. Martin* references the 1794 high water mark. 177 F.2d 733 (D.C. Cir. 1949). It would seem that the relevant high water mark would also be the 1791 high water mark.

mark of 1794 because these riparian rights did not include the right to lay fill.  *Groen*, 72 F.

Supp. at 716.[16]

The D.C. Circuit disagreed with the United States and held that the riparian owners had

the right to "make fills and build wharves in the river." 177 F.2d at 734.  In so holding, the D.C.

Circuit relied on the above-referenced *dicta* from *Belt*, in which the D.C. Circuit stated that

riparian owners have the right to construct landings, piers, and wharves in the Potomac River.

*Id.*  Thus, *Belt*'s *dicta* became the basis for *Martin*'s holding that riparian owners have the right

to lay fill on the bed of the Anacostia River.

In a subsequent decision, *Martin v. Standard Oil Co. of New Jersey*, the D.C. Circuit

affirmed its holding in *Martin*.  198 F.2d 523 (D.C. Cir. 1952).  In *Standard Oil*, the D.C. Circuit

noted that, in *Martin*, the D.C. Circuit had "held that [plaintiff] had a qualified right to lay fill

and construct wharves, subject to exercise by the United States of its power with regard to

navigation." 198 F.2d at 528 n.1.

Accordingly, the law of the D.C. Circuit is that, with respect to the Potomac River within

the boundaries of the District of Columbia, riparian owners have the right, pursuant to Maryland

law as it existed in 1801, to lay fill and construct wharves.[17]  This right is not absolute, however.

---

[16]  At the district court level, *Martin*, 177 F.2d 733, was captioned *United States v. Groen*, 72 F. Supp. 713 (D.D.C. 1947).

[17]  *Belt*, 172 F.2d 761, *Martin*, 177 F.2d 733, and *Standard Oil*, 198 F.2d 523, all involve riparian rights on the Anacostia River, whereas the instant action involves riparian rights on the Potomac River.  This is a distinction without a difference.  Riparian rights on the Anacostia and Potomac Rivers within the District of Columbia are governed by the same law–Maryland law as it existed in 1801.

It is "subject to such general rules and regulations as [Congress] may think proper for the regulation of the public." *Belt*, 142 F.2d at 767. Thus, the right of riparian owners to lay fill and construct wharves is properly described as a *qualified* right. *Id.*; *Martin*, 177 F.2d at 734. Furthermore, riparian owners do not, by virtue of this right to lay fill and construct wharves, obtain title to the land and/or water underneath these structures. *See Morris*, 174 U.S. at 286 (finding that defendants who constructed wharves on the Potomac River did not, by virtue of such construction, gain title to the land and water thereunder; title to this land remained with the United States); *cf Marine Ry*, 265 F. at 441-43 (finding that United States, which deposited fill on the bed of the Potomac River, had title to this fill). This title remains with the United States.[18]

The United States asks this court to reject *Belt*, 172 F.2d 761, *Martin*, 177 F.2d 733, and *Standard Oil*, 198 F.2d 523, as wrongly decided. The United States notes that these cases, in

---

Old Dominion also argues that, even if riparian owners have no right to lay fill and construct wharves on the Potomac River pursuant to Maryland law as it existed in 1801, Congress recognized and granted this right to riparian owners after 1801. The court need not address this argument because, as discussed in the text, riparian owners have the right to lay fill and construct wharves and piers under Maryland law as it existed in 1801.

[18] The United States argues that *Morris*, 174 U.S. 196, stands for the proposition that riparian owners have no right to erect wharves in the Potomac River. In so arguing, the United States relies on the following excerpt from *Morris*: "we think it impossible to reconcile the succession of acts of Congress and of the city councils with the theory that the wharves south of Water Street were erected by individuals in the exercise of private rights of property." 174 U.S. at 286. The United States misreads *Morris*. In *Morris*, the issue was not whether the riparian owners had a right to build wharves, but rather whether the existence of these wharves meant that these riparian owners had title to the land thereunder. *Id.* at 286-88. The Supreme Court held that the riparian owners did not have title to this land. Specifically, the Court found that "where . . . the lands and waters concerned are owned by the government in trust for public purposes . . . it seems more than doubtful whether an adverse possession [via wharves], however long continued, would create a title . . . at no time have congress and the city authorities renounced or failed to exercise jurisdiction and control over the territory occupied by these wharves and docks." *Id.* at 286. *Morris* did not address the question of whether riparian owners have the right to lay fill and build wharves on top of land to which they do not have title.

pertinent respects, rely on the Maryland Court of Appeals' 1875 decision in *Baltimore & O.R. Co. v. Chase*, 43 Md. 23 (1875), that riparian owners have a "well-settled" right at common law to make improvements to their property, such as by constructing "a landing, wharf or pier." *Belt*, 142 F.2d at 767.  The United States argues that *Chase* was wrongly decided, and thus the three D.C. Circuit cases that rely on *Chase* were wrongly decided.  The United States is correct that *Chase* is subject to at least two criticisms.

First, even though *Chase* asserts that it is "well-settled" that riparian owners have the right to make improvements to their property, *Chase* does not cite any Maryland authority for this proposition.  *Chase* instead cites state law cases from Connecticut and Indiana.  43 Md. 23, 1875 WL at *5.  *Chase* also cites three United States Supreme Court cases: *Yates*, 77 U.S. 497, *Schurmeier*, 74 U.S. 272, and *Dutton*, 66 U.S. 23.  As discussed *supra*, in *Shively*, the Supreme Court limited the scope of these three cases.  152 U.S. at 37.  The Court made clear that these three cases do *not* stand for the proposition that riparian owners have well-established rights to make improvements to their property.  *Id.*

Second, there are several Maryland court cases that post-date *Chase* that contradict *Chase*'s statement that riparian owners have a common law right to lay fill and build wharves. For example, in *People's Counsel for Baltimore County v. Md. Marine Manuf. Co.*, the Maryland Court of Appeals stated that, pursuant to *Chase*, "[t]here is some indication that the riparian owner's common law rights also included the right to 'wharf out' for the purpose of access to navigable water."  560 A.2d 32, 37 n.5 (Md. 1989).  The court then went on to say that "[t]here is also law to the contrary," *id.*, and cites several Maryland state cases, such as *Melvin v. Schlessinger,* 113 A. 875 (1921), and *Cahill v. Baltimore,* 196 A. 305 (1937).  The court then

25

stated that "we have held that the right to build a wharf or other structure into the water can be derived only from a grant or permission of the state, because virtually all land under water belongs to the state." *Id.* at 502.  Thus, *People's Counsel* calls into question *Chase*'s statement that riparian owners have the right to build wharves and lay fill pursuant to common law.[19]

However persuasive these criticisms of *Chase*, 43 Md. 23, may be, this court declines the United States' invitation to reject *Belt*, 172 F.2d 761, *Martin*, 177 F.2d 733, and *Standard Oil*, 198 F.2d 523, as wrongly decided.  The fact remains that the D.C. Circuit has interpreted Maryland law as it existed in 1801 as granting riparian owners the right to lay fill and construct wharves.  This court is bound to follow the law of the D.C. Circuit.

**D.     Old Dominion Has a Qualified Right to Lay Fill and Construct Wharves Within Harbor Lines**

As discussed *supra*, while Old Dominion has a right to lay fill and construct wharves on the bed of the Potomac River, Old Dominion's right is not absolute.  It is instead a "qualified right" that is subject to the United States' authority to regulate navigation on the Potomac River. *Belt*, 142 F.2d at 767.  Old Dominion asserts that the United States regulates navigation through harbor lines, and that Old Dominion can lay fill and construct wharves so long as these structures are shoreward of these lines.

---

[19]   Similarly, in *Harbor Island Marina, Inc. v. Bd. Of County Com'rs of Calvert County, Md.*, the Maryland Court of Appeals found that, pursuant to common law, riparian owners have the right to "any increase of soil formed by the gradual recession of the waters, or any gain by the gradual . . . formation of what is called alluvion."  407 A.2d 738, 745 (1979).  According to the Court of Appeals, the purpose of this riparian right is to "preserve the riparian owner's ability to gain access to . . . navigable water." *Id.*  The Maryland Court of Appeals went on to say that "[b]eginning in 1745, and throughout the ensuing years, there have sporadically been legislative enactments recognizing, expanding, and redefining the rights and privileges riparian owners were entitled to exercise in the tidal waters abutting their lands." *Id.*

The United States concedes that the United States regulates navigation through harbor lines, but asserts that not all of the property to which Old Dominion holds record title is shoreward of applicable harbor lines.  The United States further asserts that riparian owners can lay fill and construct wharves only if the public has access to these structures.  The United States contends that because Old Dominion prevents the public from accessing the North and South Tracts, Old Dominion's use of the land is improper.

### 1.  Old Dominion Can Lay Fill and Construct Wharves Shoreward of Harbor Lines

Old Dominion asserts that the United States regulates navigation on the Potomac River through harbor lines and that the harbor lines establish the limits beyond which riparian owners cannot lay fill or construct wharves or piers.  Old Dominion asserts that riparian owners can construct such structures shoreward of these harbor lines, and that all of the fast land on the North and South Tracts is located shoreward of these harbor lines.

In its opposition brief, the United States largely agrees with Old Dominion's description of harbor lines, but goes on to argue that, because these harbor lines serve only to mark the area in which riparian owners can construct fast lands, these harbor lines do not grant Old Dominion title to any land.  In so arguing, the United States addresses a non-issue.  Old Dominion does not argue that these harbor lines grant Old Dominion title to the fast lands at issue.  Rather, Old Dominion argues only that the harbor lines mark the area in which it, as a riparian owner, can lay fill and construct wharves.

Old Dominion's description of harbor lines is correct.  Harbor lines are lines beyond which "no piers, wharves, bulkheads, or other works may be extended or deposits made without

approval of the Secretary of the Army."  33 C.F.R. § 320.2(c); *Groen*, 72 F. Supp. at 721 (stating

that harbor lines constitute an invitation to lay fill and construct wharves shoreward of the line).

Pursuant to the Rivers and Harbors Act of 1899 ("1899 Act"), Act of Mar. 3, 1899, 30

Stat. 1121,[20] the Army Corp of Engineers established harbor lines in front of the Alexandria

waterfront.  These 1939 harbor lines consist of a bulkhead line and a pierhead line.  A bulkhead

line is a line beyond which no solid fill may be constructed.  A pierhead line is a line beyond

which no open pile structures may be constructed.

Old Dominion contends that it has the right to possess all the solid fill and open pile

structures on the North and South Tracts because these lands are within the 1939 harbor lines.

The United States rejoins that these harbor lines have no bearing on the instant case because Old

Dominion has no right to lay fill or build wharves under Maryland law as it existed in 1801.  The

---

[20]  These harbor lines were initially drawn in 1909, and reestablished in 1939.  While the court has a copy of only the 1939 harbor lines, it appears that the 1909 and 1939 harbor lines are the same.  The map of harbor lines drawn by the Corp of Engineers in 1939 was submitted as Exhibit 3 by Old Dominion.  This map contains a table entitled "Revisions" that has a single entry, dated June 20, 1939, which states: "Harbor lines shown hereon, reestablished as approved by the Secretary of War June 1, 1909."

Prior to the 1909 harbor lines, the Alexandria waterfront was governed by harbor lines established by the Alexandria common council in 1831.  In their briefs, the United States and Old Dominion raise various arguments regarding the 1831 harbor lines.  For example, the United States contends that portions of the North and South Tracts may have been constructed in violation of the 1831 harbor lines.

The court will not address arguments involving the 1831 harbor lines because these harbor lines no longer govern the Alexandria waterfront.  The 1899 Rivers and Harbors Act provides that "the harbor lines of the District of Columbia shall be determined" by the Chief of Engineers and the Commissioners of the District of Columbia, subject to the approval of the Secretary of War.  30 Stat. at 1151.  Furthermore, 33 U.S.C. § 405 provides that "after July 25, 1912, harbor lines in the District of Columbia" are to be established or modified pursuant to 33 U.S.C. § 404.  Section 404 authorizes the Secretary of the Army to establish harbor lines.  Thus, the 1831 harbor lines established by the Alexandria common council are no longer relevant.

United States argues that these harbor lines are relevant only if riparian owners have the right to lay fill or build wharves.

For the reasons discussed *supra*, Old Dominion does have the right to lay fill and construct wharves on the bed of the Potomac River.  Accordingly, Old Dominion may construct and possess fill and wharves on the North and South Tracts, so long as these structures are within harbor lines.

In its response to Old Dominion's statement of material facts, the United States concedes that the open pile piers on the North and South Tracts are located within the pierhead line.  The United States, however, denies that all of the solid fill on these tracts are located within the bulkhead line.  The United States has submitted a map that indicates that a small portion of the South Tract is located beyond the 1939 bulkhead line.  Pl.'s  Ex. 2.[21]  This map indicates that the rest of the solid fill on the South Tract, as well as all of the solid fill on the North Tract, are within the 1939 bulkhead line.

Accordingly, there is a material question of fact as to whether Old Dominion can possess all of the solid fill on the South Tract.  There is no material question of fact as to whether Old Dominion is entitled to possess all of the open pile structures on the North and South Tracts, as well as the solid fill on the North Tract.

---

[21]  The United States does not specify which harbor lines are drawn on this map.  The court assumes that this map reflects the 1909 harbor lines, as reestablished in 1939.

29

*2.  Old Dominion Does Not Need to Permit the Public to Access Fill and Wharves*

The United States further argues that Old Dominion's use of the fill and wharves on its property is improper because Old Dominion has excluded the public from its land by erecting a fence around its property.  The United States argues that, by virtue of excluding the public, Old Dominion's use of its property is inconsistent with the jus publicum, whereby the United States holds the beds of navigable waters in trust for public purposes, such as navigation and fishery.  In other words, the United States essentially argues that riparian owners cannot use wharves and fill for their own purposes, and that they must allow the public access to all wharves and fill on their land.

The United States cites no authority in support of this broad and unilateral proposition.  In contrast, there is authority recognizing that riparian owners have the right to build improvements for their own use.  *See, e.g.*, *Shively*, 152 U.S. at 40 (recognizing that a riparian owner "has the right . . . to construct a wharf or pier projecting into the stream [] for his own use"); *Dutton*, 66 U.S. at 33 ("the owner may have the right to the exclusive enjoyment of the structure"); *Chase*, 1875 WL 4912, at *5 ("the riparian proprietor . . .[has] the right to make a landing, wharf or pier for his own use"); 66 C.J.S. *Navigation* § 90 (2008) ("The owner of a littoral or riparian property generally has an *exclusive*, yet qualified right . . . [to] wharf out.") (emphasis added).  Not all of these authorities are precedential.  But because there is significant authority stating that riparian owners can construct wharves and lay fill for private purposes, the court rejects the United States' position that fill and wharves can only be used for public purposes.

**E.      Equitable Defenses**

Old Dominion additionally asserts that the United States' title claim is barred by equitable defenses, specifically the doctrines of laches and equitable estoppel.  Old Dominion further contends that the United States' action is barred because Congress has ratified the existence of fill and wharves on the Alexandria waterfront.  Old Dominion also argues that the United States cannot assert title to its land because Old Dominion is a *bona fide* purchaser.  Old Dominion's position is without merit.

*1.  Laches*

Old Dominion contends that the United States' title claim is barred by the laches doctrine because the United States filed suit in 1973 based on a claim of title that arose in 1791, 182 years earlier.  The defense of laches does not apply to title claims brought by the United States, however.  As stated in *Utah Power & Light Co. v. United States*, "[a]s a general rule, laches . . . is no defense to a suit by [the United States] to enforce a public right or protect a public interest." 243 U.S. 389, 409 (1917); *see also United States v. Beebe*, 127 U.S. 338, 344 (1888) (same). Here, the United States has brought this action to protect the public right to the bed of the Potomac River.  *See United States v. Insley*, 130 U.S. 263, 265 (1889) ("the United States holds the title to the property in question, as it holds all other property, for public purposes, and not for private purposes.").  Accordingly, the instant action is not barred by laches.

*2.  Equitable Estoppel*

Old Dominion also contends that equitable estoppel bars the United States' suit.  Old Dominion asserts that Congress has enacted numerous statutes that recognize the ability of

private landowners to lay fill and build wharves on the Potomac River.[22]  Old Dominion contends

that it, and its predecessors in title, relied on these statutes when it laid fill and built wharves.

The United States rejoins that Congress never recognized the ability of private landowners to lay

fill or build wharves on the Potomac River.  The United States also contends that equitable

estoppel does not apply because Old Dominion has not presented any evidence demonstrating

that it detrimentally relied on these statutes.

The United States' argument is well-taken.  Even assuming that the United States is

subject to estoppel, a "private party surely cannot prevail without at least demonstrating that the

traditional elements of an estoppel are present."  *Heckler v. Cmty. Health Serv. of Crawford

County, Inc.*, 467 U.S. 51, 61 (1984).  "An essential element of any estoppel is detrimental

reliance on the adverse party's misrepresentations."  *Lyng v. Payne*, 476 U.S. 926, 935 (1986);

*see also Heckler*, 467 U.S. at 61-62.  Old Dominion has not demonstrated how it relied on these

statutes to its detriment.  *Hecker*, 467 U.S. at 63 ("Respondent cannot raise an estoppel without

proving that it will be significantly worse off . . .").  Accordingly, equitable estoppel does not

apply here.

*3. Ratification*

Old Dominion also asserts that Congress "ratified" the existence of private wharves on

the Potomac River along the Alexandria waterfront.  Old Dominion argues that, in 1908,

Congress received a report from the Army Corp of Engineers that stated that a shoal had

obstructed navigation in the Alexandria harbor.  The report also stated that owners of privately

---

[22]  The statutes on which Old Dominion relies include: the Act of July 16, 1790, 1 Stat. 130 (accepting the cession of lands from Virginia and Maryland); the Act of May 13, 1826, 4 Stat. 162 (empowering the Common Council of Alexandria to limit the extension of private wharves into the harbor); and the River and Harbor Act of 1890, 26 Stat. 426.

owned wharves had, at their own expense, dredged the harbor to restore navigability.  After receiving this report, Congress appropriated funds to remove the shoal and continue dredging the harbor.  Old Dominion contends that, because Congress was fully aware of these private wharves when it appropriated these funds, Congress ratified their existence.

In so arguing, Old Dominion relies on two cases: *Ivanhoe Irrigation Dist. v. McCraken*, 357 U.S. 275 (1958)*, and *Brooks v. Dewar*, 313 U.S. 354 (1941).  These cases are inapposite. They stand for the proposition that Congress may "ratify" and/or approve of statutory constructions adopted, and actions taken, by executive agencies while enforcing statutory mandates.  *Ivanhoe*, 357 U.S. at 293; *Brooks*, 313 U.S. at 36.[23]  Here, there is no statutory construction at issue.  Neither is Old Dominion challenging the actions of the Army Corp of Engineers.  Old Dominion is instead asserting that, because Congress was aware of the existence of private wharves on the Alexandria waterfront, Congress must have approved of their existence.  Thus, neither precedent cited by Old Dominion is applicable, and Old Dominion's argument is without merit.

---

[23]  For example, in *Brooks v. Dewar*, pursuant to an Act of June 28, 1934, Congress required the Secretary of the Interior to establish and administer livestock grazing districts.  313 U.S. 354, 359 (1941).  The Act authorized the Secretary to issue term permits to graze livestock for a fee, but it did not explicitly authorize the Secretary to issue temporary licenses for a fee.  *Id.* Regardless, the Secretary issued temporary licenses for a fee and plaintiffs brought an action, asserting that the Secretary was not authorized to issue temporary licenses for a fee.  *Id.* at 360. The Court found that Congress was well aware that the Secretary was issuing temporary licenses instead of term permits and repeatedly appropriated the funds received by the Secretary for various purposes associated with ranges.  The Court found that the repeated appropriations confirmed the Secretary's construction of the statute and constituted a ratification of the Secretary's actions as an agent of Congress.  *Id.* at 361.

4. *Bona Fide Purchaser*

Old Dominion argues that it has title to the land at issue because it is a *bona fide*

purchaser.  In so arguing, it relies on several Supreme Court cases that hold that, although a

patent may have been fraudulently or wrongfully obtained from the United States, a subsequent

patentee cannot be deprived of the patented land so long as the subsequent patentee obtained the

land for valuable consideration, in good faith, and without notice of the fraud.  *United States v.*

*Winona & St. P.R. Co.*, 165 U.S. 463, 478-79 (1897); *United States v. California and Oregon*

*Land Co.*, 148 U.S. 31, 41-42 (1893); *Colorado Coal & Iron Co. v. United States*, 123 U.S. 307,

313 (1887).  These cases are inapposite because, as Old Dominion itself concedes, the United

States has never granted title to the land at issue in this case.[24]  Thus, Old Dominion is not a

subsequent grantee of land originally held by the United States.

_____

[24]  Old Dominion also asserts that, should the court find that the United States has the
right to possess the land at issue, the United States is required, pursuant to the Act of April 27,
1912, 37 Stat. 93 (1912) ("1912 Act"), to compensate Old Dominion for the value of the
improvements built on the land.  The 1912 Act authorizes the Attorney General of the United
States to file actions to quiet title lands along the Potomac River, including this action.  Section 4
provides:

> [I]f, on the final hearing of said cause the said Supreme Court of the District of
> Columbia shall be of the opinion that there exists any right, title, or interest in the
> land or water in this Act mentioned in any person . . . the said court shall
> forthwith and in a summary way proceed to ascertain the value of any such right,
> title, interest, or claim, exclusive of the value of any improvement to the property
> covered by such right, title, or interest made by or under the authority of the
> United States, and report thereof shall be made to the Congress.

37 Stat. 94.  Because the court has not made any such finding, and because this action is not yet at
the "final hearing" stage, the court need not address this argument.

The United States raises a different argument about Section 4.  The United States asserts
that, even if the court finds that Old Dominion has the right to possess the fast lands at issue,
Section 4 requires the court to ascertain the value of the lands that Old Dominion possesses.  The
United States contends that the court must do so in order to assist Congress in deciding whether
to purchase or condemn these lands.  The United States goes on to argue that such a report would
be advisory and unconstitutional.  Because the court has not yet ascertained whether Old
Dominion has the right to possess all land on the North and South Tracts, the court will not now
address the United States' argument as to the court's obligations under Section 4.

### III.  MISCELLANEOUS

In addition to the United States, two other parties filed opposition briefs to Old Dominion's motion for summary judgment: Old Town Yacht Club ("the Yacht Club") and the Northern Virginia Conservation Council ("the Conservation Council").

The Yacht Club is one of the original defendants in this action.  In its opposition brief, The Yacht Club argues that this court should deny summary judgment with respect to the Yacht Club's property interest.  Old Dominion has not moved for summary judgment with respect to the Yacht Club's property; Old Dominion has moved for summary judgment only with respect to Old Dominion's property.  Accordingly, this court's ruling neither grants nor denies summary judgment with respect to the Yacht Club's property.

The Conservation Council is a permissive intervenor in this action.  On November 17, 1986, this court permitted the Conservation Council to intervene solely to: (1) file legal briefs and memoranda on the authority of the Government to settle claims related to the land and property located on the Virginia side of the Potomac River between the present shoreline and the high water mark of 1791 only, and (2) file legal briefs and memoranda and submit into the record any maps, surveys and other documents relating solely to the issue of the location of the high water mark of 1791.  The Conservation Council filed an opposition brief on May 25, 1988, arguing that Old Dominion has no riparian rights due to defects in Old Dominion's title.  This argument exceeds the limited purposes for which the Conservation Council was granted permission to intervene, and the court declines to address it.[25]

---

[25]  Old Dominion requests attorneys' fees.  The court will not now consider Old Dominion's request.

## IV.  CONCLUSION

For the reasons explained in the foregoing memorandum opinion, the court concludes that the United States has fee title to the bed of the Potomac River to the high water mark of 1791. Old Dominion has a riparian right to construct fill and build wharves over the bed of the Potomac River, however, provided that these improvements are within harbor lines established by the United States.  Because there is no dispute of material fact that all of the fast land on the North Tract is within the 1939 bulkhead and pierhead lines, Old Dominion is entitled to possess this fast land.  Similarly, because there is no dispute of material fact that all of the open pile piers on the South Tract are within the 1939 pierhead line, Old Dominion is entitled to possess this land. There is, however, a dispute of material fact as to whether all of the solid fill on the South Tract is within the 1939 bulkhead line.

Accordingly, for the foregoing reasons, it is this 3rd day of September 2008, hereby **ORDERED** that Old Dominion Boat Club's motion for summary judgment is **GRANTED** in part and **DENIED** in part.

Henry H. Kennedy, Jr.
United States District Judge